# UNITED STATES DISTRICT COURT
# DISTRICT OF MINNESOTA

AHMAD ABNULNASIR AHMAD,

    Plaintiff,

v.

HEATHER WEYKER, *in her individual capacity as a St. Paul Police Officer*; JOHN BANDEMER, *in his individual and official capacities as a St. Paul Police Sergeant*; JOHN DOES 3-4, *in their individual and official capacities as supervisory members of the St. Paul Police Department*; *and* THE CITY OF ST. PAUL,

    Defendants.

Case No. 16cv1902 (JNE/TNL)
ORDER

## I.    INTRODUCTION

Plaintiff Ahmad Abnulnasir Ahmad alleges violations of his constitutional rights in an investigation that led to his indictment by a federal grand jury and his subsequent arrest, a trial, and his acquittal on both counts in which he was charged. He sues Defendants Heather Weyker, a police officer for the St. Paul Police Department in Minnesota; John Bandemer, a St. Paul Police Department sergeant who is alleged to have been Weyker's supervisor; John Does 3-4, who are allegedly supervisory St. Paul police officers; and the City of St. Paul ("St. Paul"). Weyker and Bandemer move to dismiss Ahmad's complaint pursuant to Federal Rule of Civil Procedure 12(b)(6) for failure to state a claim and on absolute and qualified immunity grounds. Dkt. No. 36. St. Paul moves on behalf of the City of St. Paul and John Does 3-4 for judgment on the pleadings pursuant to Rule 12(c). Dkt. No. 45.

The investigation at the core of Ahmad's civil complaint targeted a suspected venture involving the sex-trafficking of minor girls across Minnesota, Tennessee, and Ohio. The

investigation resulted in the criminal indictment of thirty people, mostly Somali, in the Middle District of Tennessee in 2010-2011 ("Tennessee Case"). Ahmad alleges that Weyker and Bandemer fabricated evidence about him and others throughout the investigation, resulting in a tainted indictment that was further corrupted by Weyker's continuing deception, and causing his arrest and detention without probable cause.

Nineteen of Ahmad's co-defendants in the Tennessee Case bring separate suits similarly alleging constitutional violations, and a twenty-first person brings another related civil suit. The parties agreed to coordinated briefing on the Defendants' motions. The Court assumes familiarity with its fuller opinion in one of the related cases, *Osman v. Weyker, et al.*, No. 16cv908 ("Osman Opinion") (filed simultaneously herewith), and will not repeat that opinion's discussion verbatim here. Ahmad, coordinating with the other plaintiffs represented by his counsel, opposed the Defendants' motions. *See* GBBS Pls.' Opp. to St. Paul Mot., Dkt. No. 50; GBBS Pls.' Opp. to DOJ Mot. to Dismiss, Dkt. No. 53.

The Court held a hearing on Defendants' motions on May 3, 2017, and now grants in part and denies in part Weyker and Bandemer's motion and grants St. Paul's motion.[1]

**II.    APPLICABLE STANDARDS**

A motion to dismiss or a motion for judgment on the pleadings is appropriately granted "only when there is no dispute as to any material facts and the moving party is entitled to judgment as a [m]atter of law." *Greenman v. Jessen*, 787 F.3d 882, 887 (8th Cir. 2015) (citation omitted). To survive a Rule 12 motion, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556

---

[1] The United States also filed a Motion to Substitute and Dismiss, which was mooted by stipulation as recognized by the April 12, 2017 Order Permitting the GBBS Plaintiffs to Amend Complaints. Dkt. No. 60. Pursuant to that order, Ahmad filed an Amended Complaint [Dkt. No. 61] ("AC"), which is thus the operative complaint subject to these Rule 12 motions.

U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)); *Haney v. Portfolio Recovery Assocs., LLC*, 837 F.3d 918, 924 (8th Cir. 2016), *as amended* (Dec. 27, 2016). *See also* Osman Op. 3-4.

### III. ALLEGATIONS

Most of the allegations are similar to those alleged by Osman and summarized and analyzed in the Court's order in that case. *See, e.g.*, Osman Op. 4-8. The Court briefly recounts some allegations in Ahmad's Amended Complaint and some facts gleaned from the Tennessee Case record.[2]

"In April 2009, Ahmad went to the mall with Haji Salad," who would later become a co-defendant in the Tennessee Case, "and a few others." AC ¶ 11. Salad's girlfriend Jane Doe Two joined. *Id.* "This was the first and only time Ahmad associated with Jane Doe Two." *Id.*

On November 3, 2010, Ahmad was indicted in a First Superseding Indictment ("FSI") in the Tennessee Case, which charged him in two counts. *See* AC ¶ 14; FSI, *United States v. Ahmad*, No. 3:10cr260, Dkt. No. 36 (M.D. Tenn. Nov. 3, 2010). These two counts alleged conspiracy to violate 18 U.S.C. § 1591(a), which criminalizes the sex trafficking of minors, sex trafficking by force, fraud, or coercion, and knowingly benefiting from participating in such a sex-trafficking venture (Counts 1 and 2).

On November 8, 2010, Ahmad was arrested in his home pursuant to this indictment. AC ¶¶ 12, 14. Federal agents "brought him to an immigration detention center," where Weyker was "[w]aiting for him." AC ¶ 12. "Weyker brought Ahmad into a room and told him he would never see daylight again unless he cooperated with her." AC ¶ 13. "Ahmad had no idea what he

---

[2] The Court may take judicial notice of public documents in the Tennessee Case record. *Greenman*, 787 F.3d at 887.

3

was arrested for. He learned about the false charges for the first time later that day in court." *Id.* "Ahmad refused to falsely admit to things he did not do nor falsely implicate others." *Id.*

The only "specific allegations related to sex trafficking" against Ahmad in the indictment "referenced a single day and *one* female listed as 'Jane Doe Two.'" AC ¶ 15. The indictment "alleged that on April 17, 2009: (1) Haji Salad picked up Jane Doe Two from high school, accompanied by Ahmad and two others, and took her to the North Town Mall in Minneapolis, where Haji Salad engaged in a sex act in the men's bathroom with Jane Doe Two; and (2), upon leaving the mall, they drove to [a] garage where one of the others [not Ahmad] engaged in a sex act with Jane Doe Two." AC ¶ 16; *see also* FSI ¶¶ 26-27.³ "Ahmad never conspired, engaged, or attempted to engage to have Jane Doe Two perform commercial sex. . . . Fabricated evidence formed the basis for these false allegations against Ahmad." AC ¶ 19. "All of the charges against Ahmad were also predicated on a fact that Weyker and Bandemer knew they could not prove: that Jane Doe Two was a minor." AC ¶ 23.

Weyker, by forming "a deep and manipulative relationship with Jane Doe Two and the other Jane Doe witnesses—whom she referred to as 'my girls' in a news interview about the Vice Unit's biggest indictment," manipulated and coerced Jane Doe Two and other witnesses into giving false testimony. *See, e.g.*, AC ¶¶ 20, 25. In a Sixth Circuit opinion, the court made several remarks about Weyker's interactions with Jane Doe Two, including that "meetings [between Weyker and Jane Doe Two at her school] . . . produced a story in which Jane Doe 2 was not a troubled runaway or juvenile delinquent, but was instead an innocent child taken in by a Somali gang who used her for sex" and that "Jane Doe 2 herself furthered the district court's suspicion when she testified on cross examination that Weyker had misstated facts in the reports,

---

³ The indictment also alleged that Ahmad was a member of two Somali gangs based in Minneapolis. *See* FSI ¶ 1(f).

4

adding to and omitting things from her statements." AC ¶ 28 (quoting *United States v. Fahra*, 643 Fed. Appx. 480, 482 (6th Cir. Mar. 2, 2016)).

In March 2012, a criminal trial began in which Ahmad was tried on the only two charges against him. *See* AC ¶ 33. At the trial, Weyker "was not even called as a witness" because her "credibility was so eviscerated" by that point. AC ¶ 34.

The jury acquitted Ahmad of all charges. AC ¶ 37; *United States v. Adan*, 913 F. Supp. 2d, 555, 560 (M.D. Tenn. 2012). Five other defendants were fully acquitted by the jury. *Adan*, 913 F. Supp. 2d at 560. Three of his co-defendants were found guilty on some counts. *Id.*; *see also* AC ¶ 38. "The trial judge, however, granted a judgment of acquittal for those defendants," on the basis of a variance between the sex-trafficking conspiracy charged in Counts 1 and 2 and the multiple conspiracies proved at trial. AC ¶ 38; *see Adan*, 913 F. Supp. 2d at 579. In March 2016, the Sixth Circuit affirmed the district court's grant of the three convicted defendants' motions for judgment of acquittal pursuant to Federal Rule of Criminal Procedure 29. *See Fahra*, 643 Fed. Appx. at 493-94; AC ¶ 39.

A judgment of acquittal was entered, and Ahmad was ordered discharged. *United States v. Ahmad*, No. 3:10cr260, Dkt. No. 2558 (M.D. Tenn. June 8, 2012).

Ahmad "would never have been indicted on sex trafficking charges," nor detained, "had Weyker and Bandemer not fabricated evidence, cultivated and manipulated Jane Doe Two, manufactured testimony and misled federal authorities." AC ¶¶ 41-42.

Like Osman, Ahmad alleges that the charges of a wide-ranging sex-trafficking conspiracy were baseless and that Weyker fabricated "[t]he overwhelming majority of material evidence supporting [his] indictment," AC ¶ 22; that Weyker manipulated and coerced Jane Doe witnesses, including Jane Doe Two, into lying, *e.g.*, AC ¶¶ 20, 25, 27; and that indications of

5

Weyker's fabrication included her rough notes, AC ¶¶ 28, 35-36, questions surrounding Jane Doe Two's age, AC ¶¶ 30-31, questions surrounding Jane Doe Two's April 2009 trip to Nashville (which did not involve Ahmad), AC ¶¶ 21, 28, and the results of the April 2012 trial, AC ¶¶ 37-38. Also like Osman, Ahmad's complaint repeatedly cites to remarks about Weyker and the case by the district and appellate courts in the Tennessee Case. *E.g.*, AC ¶¶ 21, 24 n.1, 28, 30, 35, 39, 44.

## IV. SUMMARY OF ARGUMENTS

A summary of the parties' arguments is included in Section IV of the Court's opinion in *Yusuf v. Weyker, et al.*, No. 16cv1012 (D. Minn.), filed simultaneously herewith. Ahmad is represented by the same counsel as Yusuf.

## V. LEGAL ANALYSIS

As explained fully in the Osman Opinion, pursuant to *Manuel v. City of Joliet*, 137 S. Ct. 911 (Mar. 21, 2017), Ahmad's claims must be analyzed under the Fourth Amendment, not the Fifth or Fourteenth. *See* Osman Op. 11-13; *see also id.* at 17-22. His complaint is that "[b]ut for the false testimony and other erroneous evidence manufactured by Weyker and Bandemer, no probable cause existed to detain or otherwise restrict Ahmad's liberty." AC ¶ 1; *see also* AC ¶¶ 41-42. In other words, he complains "that a form of legal process resulted in pretrial detention unsupported by probable cause." *Manuel*, 137 S. Ct. at 919. So "the right allegedly infringed lies in the Fourth Amendment." *Id.* A "constitutional division of labor" applies to claims similar to Ahmad's. *Id.* at 920 n.8 (referring to *Gerstein v. Pugh*, 420 U.S. 103 (1975), and *Albright v. Oliver*, 510 U.S. 266 (1994)). Thus, because he challenges his pretrial detention, his claim is under the Fourth Amendment. In contrast, if he had been convicted and were to challenge the sufficiency of the evidence supporting that conviction, his claim would then be

6

analyzed under the Due Process Clause of the Fourteenth Amendment because "once a trial has occurred, the Fourth Amendment drops out: A person challenging the sufficiency of the evidence to support *both a conviction and any ensuing incarceration* does so under the Due Process Clause . . . ." *Id.* (emphasis added) (citing *Jackson v. Virginia*, 443 U.S. 307, 318 (1979), and *Thompson v. Louisville*, 362 U.S. 199, 204 (1960)). Although Ahmad did stand trial, he was acquitted. *See Adan*, 913 F. Supp. 2d at 560. He thus challenges pretrial detention, not incarceration imposed pursuant to a sentence, and his claims still fall under the Fourth Amendment. *Compare with Jackson*, 443 U.S. at 316 (describing the due process guarantee "that no person shall be made to *suffer the onus of a criminal conviction* except upon sufficient proof") (emphasis added), *and Thompson*, 362 U.S. at 206 (holding that it violates due process "to convict and punish a man without evidence of his guilt"). Ahmad's claims for substantive due process violations under the Fifth or Fourteenth Amendments therefore fail. *See Manuel*, 137 S. Ct. at 919-20; *Albright*, 510 U.S. at 271 (plurality opinion).[4]

Under the Fourth Amendment analysis, the Court must decide whether Ahmad plausibly alleges that the Defendants violated his right to be free from unreasonable seizure by arresting and detaining him without arguable probable cause, based on fabricated evidence.[5]

To evaluate whether a person's Fourth Amendment right has been violated by an arrest pursuant to a warrant that lacked probable cause, the court applies the analysis set out in *Franks*

---

[4] As explained in a footnote in the Court's simultaneously filed order in *Yusuf v. Weyker, et al.*, No. 16cv1012, the attempt to distinguish *Albright* in his opposition papers, which were filed without the benefit of the *Manuel* decision, is not persuasive in light of the *Manuel* Court's clear interpretation of *Albright*. *See Manuel*, 137 S. Ct. at 918.

[5] Because the Court finds that only the Fourth Amendment, and not substantive due process, is applicable; because a Fourth Amendment claim in this case does not present a new context for a *Bivens* action; and because § 1983 and *Bivens* claims are analyzed similarly, the Court does not reach the question of whether Ahmad's claim should be brought under § 1983 or *Bivens*. *See* Osman Op. 13-17.

7

*v. Delaware*, 438 U.S. 154 (1978). *See Hawkins v. Gage Cty.*, 759 F.3d 951, 958-59 (8th Cir. 2014); *Hernandez-Cuevas v. Taylor*, 723 F.3d 91, 101, 105 (1st Cir. 2013). Thus, the court considers whether there were deliberately or recklessly false statements made in support of a finding of probable cause and whether those statements were necessary to the finding of probable cause. *See Franks*, 438 U.S. at 156; *Williams v. City of Alexander*, 772 F.3d 1307, 1311 (8th Cir. 2014). The court also considers whether material information was omitted with the intent to mislead or with reckless disregard as to whether the omission was misleading. *See Williams*, 772 F.3d at 1312; *Hawkins*, 759 F.3d at 959. If, setting aside the false statements (or adding in the omitted information), there was no probable cause to arrest, then the arrest violated the Fourth Amendment. *See Williams*, 772 F.3d at 1312-13; *Hawkins*, 759 F.3d at 958-59; *Hernandez-Cuevas*, 723 F.3d at 105. Probable cause "exists when the totality of the circumstances at the time of the arrest are sufficient to lead a reasonable person to believe that the defendant has committed or is committing an offense." *Greenman v. Jessen*, 787 F.3d 882, 888 (8th Cir. 2015) (citation omitted).

Where a plaintiff alleges that she was arrested without probable cause and the defendant asserts the qualified immunity defense, courts ask whether there was "*arguable* probable cause to arrest." *Stewart v. Wagner*, 836 F.3d 978, 984 (8th Cir. 2016) (citing *New v. Denver*, 787 F.3d 895, 899 (8th Cir. 2015)) (applying this standard to a Fourth Amendment claim for detention based on allegedly false and incomplete information in a probable cause statement). "[T]he issue for immunity purposes is not probable cause in fact but arguable probable cause, that is, whether the officer should have known that the arrest violated plaintiff's clearly established right." *New*, 787 F.3d at 899. "It is clearly established that the Fourth Amendment requires a *truthful factual showing* sufficient to constitute probable cause before an arrest warrant can issue." *Peterson v.*

*City of Plymouth*, 60 F.3d 469, 477 (8th Cir. 1995) (emphasis added) (quoting *Moody v. St. Charles Cty.*, 23 F.3d 1410, 1412 (8th Cir. 1994)).

### a. Analysis of Ahmad's Claim Under the Fourth Amendment

In considering whether Ahmad plausibly alleges a Fourth Amendment violation, the Court disregards mere conclusory statements, focuses on well-pleaded factual allegations, and applies its judicial experience and common sense. *See Ashcroft v. Iqbal*, 556 U.S. 662, 678-79 (2009). The Court also properly considers the Tennessee Case court record in assessing the pleadings. *See, e.g.*, *Greenman*, 787 F.3d at 887.

Ahmad's core allegations are very similar to Osman's, including the ample citations to comments by the Tennessee Case district court and a related appellate decision. In the Osman Opinion, the Court examines several orders and memoranda by the district court and two separate Sixth Circuit Court of Appeals opinions concerning the Tennessee Case, some of which both Osman and Ahmad cite. *See* Osman Op. 25-33. For instance, similar to Osman's allegations that the jury and district court acquitted nine of her co-defendants after the Spring 2012 trial, Ahmad alleges that the jury acquitted him and five other defendants completely and that the district court granted the other three defendants' motions for judgment of acquittal[6] after their trial. *See* AC ¶¶ 37-38. Also like Osman, he cites repeatedly to the district court's post-trial order on the Rule 29 motions and to the appellate opinion affirming that order. *E.g.*, AC ¶¶ 21, 24 n.1, 28, 30, 35, 39. For instance, he quotes the *Fahra* opinion's noteworthy description of the "story" the prosecution presented at trial as "likely a fictitious story." AC ¶¶ 28, 39 (quoting *Fahra*, 643 Fed. Appx. at 484). Ahmad also quotes some pointed remarks in that

---

[6] Ahmad's careful phrasing—alleging that the district court "granted a judgment of acquittal" as to the three defendants whom the jury convicted, rather than alleging that the district court "acquitted them"—may reflect some of the same considerations that the Court discusses in an aside on the phrase "acquitted" in the Osman Opinion. *See* Osman Op. 23-25.

9

opinion about testimony and evidence surrounding a trip Jane Doe Two took to Nashville in April 2009 (even though the indictment did not allege that Ahmad was involved with that trip), in order to support his allegations that Weyker manipulated Jane Doe Two into fabricating evidence in support of the large-scale sex-trafficking conspiracy. AC ¶ 21 (quoting *Fahra*, 643 Fed. Appx. at 482-83); *see also* AC ¶ 28 (noting a potential inconsistency as to whether Jane Doe Two was "abducted" to Tennessee). The Osman Opinion discusses in detail the district court's *Adan* opinion and the Sixth Circuit *Fahra* opinion, as well as other cited documents, including a pretrial memorandum at Dkt. No. 1392 concerning photographic show-ups conducted by Weyker and references to a July 31, 2012 detention hearing.

In Osman's case, the Court found that some of these statements by judicial officers are remarkable, and that taken all together along with other well-pleaded facts, they nudge Osman's Fourth Amendment claim as to Weyker over the *Iqbal* plausibility line. Ahmad was exclusively charged with sex-trafficking-related crimes. Therefore, consistent with the analysis in the Osman Opinion, *see* Osman Op. 17-20, 22-28, 35, the Court finds that Ahmad's allegations of a Fourth Amendment violation by Weyker in fabricating evidence related to sex trafficking also survive Weyker's motion to dismiss. The same caveats that the Court noted in the Osman Opinion apply as well to Ahmad's allegations. Like Osman, Ahmad has also included some factual allegations more specifically relating to his case, in addition to his detailed references to particular remarks by the district and appellate court. Ahmad specifically denies that he ever was involved in any efforts to have Jane Doe Two engage in sex for money. AC ¶ 19. And he was acquitted by the jury on all such charges. He also alleges that the one and only time he ever "associated with Jane Doe Two" was one trip to the mall with friends in April 2009. AC ¶ 11.

Considering all of Ahmad's allegations as to Weyker, the Court finds they meet the *Iqbal* standard.

The same cannot be said for Ahmad's allegations about Bandemer. His allegations as to Bandemer are conclusory and lacking well-pleaded facts. And none of the judicial statements that lend some plausibility to the allegations about Weyker refer to Bandemer in any way. Ahmad does not plausibly plead that Bandemer directly violated his civil rights. Bandemer is entitled to qualified immunity on Counts 1 and 5.

### b. Supervisory Liability

Ahmad also sues Bandemer and John Does 3-4 in their individual capacities as supervisors. He alleges that they were deliberately indifferent to or authorized Weyker's alleged violations of his constitutional rights. *E.g.*, AC ¶ 46. He does not allege that John Does 3-4 have supervisory responsibility over Bandemer. *See* AC ¶¶ 8, 66.

A supervisor sued in his or her individual capacity in a § 1983 or *Bivens* suit "is only liable for his or her own misconduct." *Iqbal*, 556 U.S. at 677; *see also S.M. v. Krigbaum*, 808 F.3d 335, 340 (8th Cir. 2015). "When a supervising official who had no direct participation in an alleged constitutional violation is sued for failure to train or supervise the offending actor, the supervisor is entitled to qualified immunity unless plaintiff proves that the supervisor (1) received notice of a pattern of unconstitutional acts committed by a subordinate, and (2) was deliberately indifferent to or authorized those acts." *Krigbaum*, 808 F.3d at 340 (citing *Livers*, 700 F.3d at 355). "This rigorous standard requires proof that the supervisor had notice of a pattern of conduct by the subordinate that violated a clearly established constitutional right. Allegations of generalized notice are insufficient." *Id.* The notice prong requires that "[t]o

11

impose supervisory liability, other misconduct [allegedly giving the supervisor notice] must be very similar to the conduct giving rise to liability." *Id.* (quoting *Livers*, 700 F.3d at 356).

Ahmad's complaint, which is again very similar to Osman's complaint as to the supervisory liability allegations, likewise contains few allegations—and fewer well-pleaded facts—regarding supervisory liability. Like Osman, he alleges that Bandemer and the John Does had supervisory responsibility over Weyker, *see, e.g.*, AC ¶ 66; that the investigation was very important to the St. Paul Police Department vice unit, AC ¶ 20; and that "[b]y at least February 15, 2012, these [supervisory] defendants had actual knowledge" of Weyker's fabrications based on a February 2012 memorandum-order at Dkt. No. 1392 and other district court orders, *id.* ¶¶ 43-44, 46. Like Osman, Ahmad cites *United States v. Mohamud*, No. 3:10cr260, 2013 WL 1935506, at *11 n. 6 (M.D. Tenn. May 9, 2013), and *United States v. Adan*, 913 F. Supp. 2d 555, 589 n.10 (M.D. Tenn. Dec. 19, 2012), in support of his supervisory liability notice allegations. AC ¶¶ 43-44.

As explained in the Osman Opinion, these allegations do not sufficiently plead supervisory liability based on notice. *See* Osman Op. 37-41. Nor do they establish a pattern of unconstitutional acts by Weyker. Ignoring conclusory or unsupported allegations, Ahmad does not allege any other similar acts by Weyker before the Tennessee Case investigation that could show a pattern about which Bandemer or the John Does personally knew.

The allegations fail to state a claim for supervisory liability, and Bandemer and John Does 3-4 are entitled to qualified immunity as to these counts.

    c. **Municipal Liability**

Ahmad sues St. Paul as well as Bandemer and the John Does in their official capacities for municipal liability under *Monell v. Dept. of Social Servs. of the City of New York*, 436 U.S.

658 (1978). "[A] local government may not be sued under § 1983 for an injury inflicted solely by its employees or agents." *Id.* at 694. "Instead," a municipality is liable "when execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury . . . ." *Id*.

A plaintiff therefore must show that there is an "official" policy or a "custom or usage with the force of law." *Kelly v. City of Omaha*, 813 F.3d 1070, 1075 (8th Cir. 2016). A plaintiff must plead "allegations, reference, or language by which one could begin to draw an inference that the conduct complained of . . . resulted from an unconstitutional policy or custom." *Crumpley-Patterson v. Trinity Lutheran Hosp.*, 388 F.3d 588, 591 (8th Cir. 2004) (citation omitted). Absent allegations of an official policy that was the moving force behind the violation, "[m]isconduct among a municipality's employees must be 'continuing, widespread, [and] persistent' to establish such a custom." *Kelly*, 813 F.3d at 1075 (citation omitted). Also, "the municipality will not be liable unless policymaking officials exhibit '[d]eliberate indifference to or tacit authorization of such conduct . . . after notice to the officials of that misconduct.'" *Id.* at 1075-76 (citation omitted). The question is whether a "governmental policy or custom was the 'moving force' that led to the deprivation of [the plaintiff's] constitutional rights." *Speer v. City of Wynne*, 276 F.3d 980, 986 (8th Cir. 2002). Even if no individual employee is found liable, a municipality might be liable, but only where "the combined actions of multiple officials or employees may give rise to a constitutional violation." *Id.*

Ahmad does not adequately support his conclusory municipal liability allegations with well-pleaded facts. He does not allege with well-pleaded facts that Weyker or other St. Paul Police Department employees fabricated evidence in other investigations, nor that policymaking officials in the department were aware of any previous incidents of fabrication of evidence. He

does not allege well-pleaded facts to support a theory that multiple St. Paul Police Department members—not even Weyker and Bandemer—combined to violate his rights. Nor does he allege facts that would demonstrate an official department *policy* that moved officers to fabricate evidence or coerce witnesses and mislead prosecutors and grand juries to secure indictments. He also does not plausibly allege any such *custom* because, among other reasons, he has not adequately alleged notice, as explained above. The supervisory defendants sued in their official capacities, and the City of St. Paul, are entitled to qualified immunity on these claims.

## VI. Conclusion

Defendants are entitled to qualified immunity on all counts except Counts 1 and 5 as to Weyker. As to Defendants Bandemer, John Does 3-4, and the City of St. Paul, the Court grants their motions and dismisses with prejudice. *See Ulrich v. Pope Cty.*, 715 F.3d 1054, 1060-61 (8th Cir. 2013); *C.N. v. Willmar Pub. Sch., Indep. Sch. Dist. No. 347*, 591 F.3d 624, 635 (8th Cir. 2010).

Based on the files, records, and proceedings herein, and for the reasons stated above, IT IS ORDERED THAT:

1. Defendants Heather Weyker and John Bandemer's Motion to Dismiss [Dkt. No. 36] is GRANTED IN PART and DENIED IN PART consistent with the above opinion.

2. Defendant City of Saint Paul's Motion for Judgment on the Pleadings [Dkt. No. 45] is GRANTED.

3. Plaintiff Ahmad Abnulnasir Ahmad's Amended Complaint is DISMISSED WITH PREJUDICE as to Defendants John Bandemer, John Does 3-4, and the City of St. Paul.

4. Counts 1 and 5 of Plaintiff Ahmad Abnulnasir Ahmad's Amended Complaint are DISMISSED WITH PREJUDICE to the extent they plead violations of the Fifth and Fourteenth Amendments.

Dated: August 9, 2017　　　　　　　　　　　　　　　s/ Joan N. Ericksen
　　　　　　　　　　　　　　　　　　　　　　　　　JOAN N. ERICKSEN
　　　　　　　　　　　　　　　　　　　　　　　　　United States District Judge